The Irish pronunciation is Mahan, but as Professor Fitzpatrick at Fordham Law School told me 50 years ago, Mahan is my slave name. In any event, that's how I go by. Before you start, I want to just make sure Mr. Elman is on the line as well. Mr. Elman, are you there? I am, Your Honor. Thank you. All right. So, Mr. Mahan, you've got 10 minutes, but you've reserved 2 minutes for rebuttal. So, you'll get to go 3 uninterrupted, and then we'll stop you at the 8-minute mark. Okay. Thank you very much, Your Honor. I'd like to start in a somewhat unorthodox manner by thanking Ms. Rodriguez and the staff of the Second Circuit for arranging for and guiding me and my firm, especially me, through the process of being able to participate remotely in this oral argument. These are very tough times, and I really appreciate her efforts and concern. Well, she is the best, so we agree. Turning to the case at hand, the court below, sitting in diversity, was presented with what I see as a garden-variety finder's fee case. Our client, International Technology Marketing Incorporated, I call them ITM, formed a business relationship with the defendant, Variant Systems Limited, we'll call them Variant. Throughout this relationship and the various iterations of the written memorializations of this relationship, the party specifically and repeatedly designated ITM as a mere finder. In our initial brief, as well as in our reply brief, perhaps because of my Jesuit education, we described the quote-unquote original sin of the court below, or simply put, the court below on its own sua sponte determined that ITM was a broker rather than a finder without ever having a hearing on this issue. This first error was compounded by numerous other erroneous holdings following that, which led to the appeal now before the court. For example, the court below also erroneously held that because ITM's purported status as a broker, it should be held to a one-year limitation on its finder's agreement, and consequently that any closing between Variant and the acquisition target, Suntec, introduced by ITM must have taken place by February 27, 2007, approximately two months after the parties executed the amendment to the initial contract, which is now before the court. Excuse me. You have one more minute. Okay. In so doing, the court ignored two bedrock principles of New York contract law. The first is that where a party's performance under a contract is determined by a contingent event, the contract's duration continues until that contingent event occurs. The second bedrock contract principle under New York law, which is the fact that where an amendment to a contract contradicts the initial contract or any amendment thereto, the final amendment is what controls. So that is the initial problem that I have with the court below. All right. We're on a pause there, and we'll get some questions. Judge Calabresi, do you have any questions for Mr. Mann? Yeah. My only question is, what does this amendment say? If the amendment was a very limited one, as in its own terms it seems to be, how can we say that the court was wrong in reading the original contract as having ended? Which is all they did. Your Honor, may I respond? As I view this, you have to look at the three various contracts, the first one, the amendment, and the final one. They involve completely different subject matters. The third amendment basically is a finder's fee agreement, and the finder's fee agreement basically determines whether or not my client has a right to a fee and when that right actually accrues, and it makes it clear. It says in the event that there is a closing, and then it establishes 5% of anything paid at the closing and 4% any time thereafter. So therefore, for that reason, I see it as standing alone. Is your argument that at any time, no matter how much after, if there had been a deal with the party with whom there was, you were entitled to a finder's fee? If this happened 100 years later or anything, that what this amendment did said at any time, for now and forevermore, if they purchase this company, I will be entitled to a finder's fee? Is that what you're looking at? No, I am not, Your Honor, and I'll tell you why. Then how long? Four years? Actually, four years would be fine. Two years would be fine. The limiting concept, and we talk about this in both our brief and our reply brief, is the concept of procuring cause. If, in fact, ITM was a procuring cause, and in our view, the evidence is certainly well within the ICBL rule, at least at this stage in the proceedings, that it was a procuring cause. They introduced Verint to the target, and, Your Honor, when the negotiations resumed after the Great Recession finally came to an end in 2011, we actually have e-mails saying, oh, let's take up where we left off. And it's our position that the actual closing was essentially the same terms that was originally negotiated in late 2006, early 2007. So the limitation, the reasonable time element, which of course can be read into any contractual obligation in the State of New York, that reasonable time element is supplied by the procuring cause document, which is briefed at some length in both our brief as well as our reply brief. Thank you. Judge Wesley, do you have any questions for Mr. Mann? No, I don't. Thank you. I guess I do. So, Mr. Mann, I'm just looking at the language of the first contract, and it's got a strict termination clause. In your view, what does that mean there? What has to happen within the 12 months for this contract to have been satisfied? Yes, Your Honor, that's the reason why I, at the initial statement that I made, the reason why I cited and I spoke about the December amendment contradicted the earlier amendments, including the initial one, as to the time of the performance. Whereas the initial contract talked about a one-year term ending in February 27, 2007, the December amendment basically posited the performance of Verrant to the contingent event, the contingent event, of course, being a closing. This is not an unknown in New York law. As a matter of fact, the leading case in the United States is Thiebaud v. Robinson, 100 New York 27, way back in 1882, even before I started practicing law. And it basically has been cited throughout the country and followed by the New York courts ever since. So in our view, there's a contradiction, and that brings us to the second point. The December amendment contradicted the earlier amendment, the initial agreement on that score, and the subsequent amendment controls. That's also a bedrock principle of New York law. Walker v. Millard, 29 New York 375, that actually was decided in 1864, and it's been cited with approval ever since by virtually every state in the United States, as well as the federal courts. Is it, Mr. McMahon, what you said piqued my interest. Judge Wesley, is it conceivable to say that the initial agreement could be viewed as a finder's agreement, but what was altered and became a broker's agreement as a result of the terminology, both in the September and December amendments? No, and let me tell you why, Ron. Well, it says best commercial efforts to assist and support Vernon and its activities regarding the purchase of Suntec. And then at the time that it's paid, closing in lieu of any other compensation set forth herein in prior agreement. Yes, Your Honor, and that is a finder's language, not broker. In order to be a broker under New York law, and we cite to a great deal of authority on this in our brief, in order to be a broker, you have to have the power to bind the principle. And in this particular case, specifically in the finder's fee agreement of December, they don't have the power to bind the principle. So, therefore, you're left being a finder. The fact that they say you should assist, et cetera, well, that's basically a restatement of the common law of you must act in good faith and do your best to assist a contractual principle. No fiduciary obligation was created. That is the bedrock of our argument, Your Honor. Okay, great. Thank you. Any other questions for Mr. Mann? All right, Mr. Mann, you've reserved two minutes for rebuttal, and I'll hear from Mr. Elman, who has ten minutes, but we'll give him three uninterrupted. Thank you, Your Honor. Counsel talked about bedrock principles of law. There is no greater bedrock of contract law under New York or really any other state than that an unambiguous contract should be interpreted according to its terms. And there's nothing ambiguous at all about the Second Amendment that said that except as expressly set forth herein, all terms of the original agreement remain. And one of those terms was the one-year term. There is no doubt, there is no ambiguity, there is no vagueness, there is no issue that that contract terminated in February 2007. VARIN acquired Suntec four years later. It was way after the contract was terminated. There is no amount of dancing about whether ITM was a broker or finder that will rescue its claims. And in any event, the last series of questions really hit the nail on the head that ITM was a broker under any definition of a broker. Its obligations were to use its best commercial efforts to assist and support VARIN in the acquisition of Suntec. So I will leave that issue, and of course I'll answer any questions that the court has, but I'm limited in time. So I'd like to talk a little bit about the sanctions cross-appeal. There's no doubt that Judge Woods had very broad discretion in whether or not to impose sanctions and invoke his own and the district court's inherent powers. That being said, applying the wrong legal standard is exceeding the court's discretion, and unfortunately in this case, Judge Woods did apply the wrong legal standard. Judge Woods held that a single act is not sufficient to invoke the inherent powers, but the Second Circuit in Edmund, which actually set the standard, was very clear that even a single claim brought in bad faith suffices. And in this case, first of all, there was more than one act, no matter how you slice it. Even crediting Judge Woods' logic that the only act was the allegations in the third amended complaint, those allegations consisted of multiple misrepresentations. Every single – can you all still hear me? Yes. Okay, sorry, because I dropped out before. You have one more minute. Thank you. Every single one of the four elements of the unjust enrichment claim was based on lies. There was no performance of services in good faith. Mr. Shetman, who is ITM's principal, testified in deposition that he considered himself a mercenary, that his job was to give Verint a bloody nose, that he wanted to target Verint's installations, that he wanted to assist its competitors. The element of knowledge on the receiving party was also blown apart by Mr. Shetman's deposition testimony. He alleged that he was communicating with proxies of Verint who he reasonably believed were agents of Verint. But at deposition, he admitted that he didn't know whether a single one of them had worked for Verint, was still working for Verint, had ever communicated with Verint. This case, from beginning to end, was one big lie. And we, Verint's counsel and Verint, had to spend significant money and time, and the court, more importantly, under the inherent power standard, had to spend significant resources in bringing this case to a conclusion. And I know I'm past my three minutes, so I will answer the court's questions. All right, Judge Calabresi, do you have any questions for Mr. Ellman? Yeah, I have a couple of questions. The first, I mean, there are two different claims for sanctions that you are making. One is that the original claim was absurd, and then all the things that followed on it. And there, I must say that while the argument that these amendments extended the time may be a loser, I've seen far worse arguments made in this court all the time, and I really think it's a bit much to say that it is absurd. The second argument, which goes to the statute of limitations, is a different one, and that's against the Fourth Amendment. And there, I think throughout, I think you are right that the district court misstated what Ellman did. That is, with respect to there being one thing, that that would be enough or not enough. But the district court also said quite clearly that it thought that sanctions weren't warranted in the first case because the argument was not that absurd, and in the second because it was a new counsel who was taking on the case quickly. Now, aren't those perfectly okay? Because Ellman makes conditions which are necessary but not necessarily sufficient for sanctions. So aren't we in a situation where whatever wrong statements a court may have made about one point, it also gave reasons which were valid for denying sanctions? Yes, Your Honor, I'll answer those questions. So let me start off with the first motion, which is the inherent powers, which is where Ellman comes into play. And I need to be very clear here about the distinction that the court was drawing and that we drew between the inherent power sanctions and the Rule 11. The Rule 11 went to the statute of limitations, which I'll talk about in a moment. But the inherent powers went back to the – if Mr. Mann wants to talk about the original sin, the original sin here was the filing of a third amended complaint that was based on a series of lies. That was not the statute of limitations issue, Your Honor. That was the issue. That was an unjust – that was an – Correct. Correct. So where Ellman comes into play is on inherent powers where the court will look at and say, was an act undertaken in bad faith? And in that case, Judge Woods was very clear that the acts that ITM undertook would have met the standard of bad faith. He used the words vexatious and dilatory and extortionate and all those other good words. So this has nothing to do with the statute of limitations. The only issue there is did the lower court, did the district court invoke the correct standard, use the correct standard? And respectfully, Your Honor, well, I think you're correct that Ellman says that Judge Woods did not use the correct standard. So if you take his findings that ITM acted vexatiously and extortionately and dilatorily and in bad faith and that – and he found that each of the allegations were lies. He used the word belied. Mr. Shetman's testimony belied the claims. So taking the judge's own findings but applying the correct standard is the inescapable conclusion that sanctions ought to be granted. This court should demand and there should be a hearing on the appropriate amount of sanctions. That's different than the statute of limitations argument, and I'll talk about that. And yes, Judge Woods did say that he has seen – we've all seen worse arguments about extensions of statute of limitations. But the issue with the Rule 11 is that – well, first of all, there's two things. Number one, even before you get to the statute of limitations, there's the gating issue under Rule 16b. ITM needed to show that it was diligent in making its motion to amend. We sent ITM's counsel a 15-page safe harbor letter in which we spelled out in painstaking detail exactly why it hadn't been diligent. We let counsel know that his own client, in addition to being on a constructive notice because the 8K upon which it relied was issued in 2007, it actually had that 8K in 2008. It emailed that 8K in 2008. And the law is clear that that constructive notice is enough to show that you're not diligent, and in this case, it had an actual notice. So on the Rule 11, unfortunately, Judge Woods didn't discuss at all, didn't analyze the fact that we sent a Rule 11 letter. And the statute of limitations, yes, Your Honor, there were statute of limitations arguments that are made. But when you're talking about a party that can't even get past the gating issue, and respectfully to counsel for ITM, they didn't even address Rule 16 in their brief, in their opening brief. They don't get past the gating issue, and then they raise frivolous statute of limitations arguments. I respectfully submit that this case is also right for Rule 11 on the motion to amend. Thank you. Judge Wesley, do you have any questions for Mr. Ellman? No, no. Thank you very much. So this is Judge Sullivan. I guess I have a question related to the December amendment. So, Mr. Ellman, it seems like what you're saying is that we don't even need to address broker versus finder because the amendment didn't alter the termination date of the original contract, right? Correct. And so I guess I'm just trying to be clear then what you're saying. So in your view, that if the finder lined up Suntech, did what they were contracted to do, and then a day after the contract terminates by its original terms in February of 2007, that's it. It doesn't matter. They're out of luck. Is that your view? That is my view, Your Honor, so long as there's no allegation, and there's none here, that the delay in the closing was motivated solely out of a desire to avoid paying the fee. But, Your Honor, I just want to pull back. So that would be basically a breach of the covenant of good faith and fair dealing if that's what was going on. Correct, if they could allege that. But Judge Woods said, and to credit ITM for this, they never alleged that there was a delay of four years solely to avoid paying a brokerage commission. That would have been silly. But, Your Honor, just to go back, and I forget if it was Judge Wesley or Judge Calabresi who asked the question about whether this agreement really did make clear that ITM was to provide brokerage services. The answer is yes. So I'm firm in answering Your Honor's question, but I don't think we even need to get into that much of a parsing of the law there and talk so that much about these hypotheticals because the New York Court of Appeals under Northeast General Court made clear, and in fact, ITM, again, to its credit, cited this case that whether a party is a broker or a finder is not determined by nomenclature. It's determined by what the words of the agreement are and what the acts are. And in this case, ITM was obligated to use its best commercial efforts to assist and support in the acquisition of Suntec, and that's classic brokerage language. A finder's only job is to make an introduction. A broker is charged with bringing an agreement to fruition, and that's exactly what ITM was charged with under this agreement. All right. What do you make of – in light of Judge – maybe think of something, Judge Sullivan. Thank you. This is Judge Wesley. What do you make of your opponent's argument that a broker has to have authority to bind? Your Honor, that's just not true. That's just not true. A broker can have authority to bind, but a broker – the notion that having the power to bind is a sine qua non of a brokerage relationship is just not true. That's not what the cases say. Okay. It certainly would alter the relationships in real estate brokerage arrangements, but in any event, thank you. Well, I must use that as an example about when I bought my house, it would be fairly shocking to me if I found out that my broker committed me to buy a house that I didn't really think I was buying. But, yes, that's exactly right. Thank you. All right. We'll now hear from Mr. Mann for two minutes of rebuttal. Yes, Your Honor. Very quickly on the two sanctions motions, the inherent powers motion relates to the third amended complaint, which we were not part of. However, that motion was made not only against ITM, but also against Mr. Hinton, one of the prior counsel who had been released. He's not even before the court. And I don't agree with the other side's position on Amon. I don't think that Amon was satisfied here, and we briefed that extensively. But, nevertheless, you have to take into account the fact that the lawyer who filed that particular claim is not before the court. And, in fact, the rule 11 motion is still with the court below, although they believe they've lost jurisdiction over it. Number two, when it comes to whether or not we resolve the gating issue, which we briefed extensively, one thing I have to point out is there was a pre-motion conference here, Your Honor. And the court permitted us to make the motion that we made. That doesn't mean the court was ruling that our motion was effective, but we went through a whole pre-motion procedure here to suggest that because I have a different view of the role of the statute of limitations from my learned adversary, and because he wrote a 15-page treatise, that somehow or other he has a judicial imprimatur on his view of the law is, quite frankly, taking Rule 11 and the safe harbor provisions and turning them into some kind of draconian monster, which is not what the 1993 amendments suggested. We take the position, and we continue to take the position, that we are correct and that we are right on the statute of limitations. But even if this court were to disagree with us, we certainly have the right, and I certainly have the right, as an advocate, to promote the position that we believe to be correct, cite the numerous cases and treatises that we cite in support of that position, and let the chips fall where they may. How do you do that for the Quantum Merowith claim? Well, the Quantum Merowith claim is an entirely different matter, Your Honor. Okay, but why is that not a basis for sanctions by the inherent power of the court? The Quantum Merowith claim, Your Honor, which relates to a complaint that we withdrew, okay, as soon as I was in the case. I would like to point out that their whole basis for the inherent powers claim relies upon the testimony of ITM's principal, who was deposed. They don't question that he was not telling the truth. And they took a look at every, they asked him a whole bunch of questions and came to the conclusion, the same conclusion that I did, at least on some aspects of the third amended complaint, that the claim didn't fly. That should not be the subject of inherent power sanctions. And the court was properly exercised its discretion in that regard. The Quantum Merowith claim is not before the court. It was withdrawn before this motion was made. Your Honor, I realize that the inherent powers claim is different from Rule 11, since the quote-unquote safe harbor provision of Rule 11 is not strictly applicable here. But at the time that that motion was made, that particular pleading was no longer before the court. It has been withdrawn. Mr. McMahon, Mr. McMahon, this is Judge Wesley. If there had been a fraud on the court, you can't unring the bell by withdrawing the complaint, can you, if a party, and I realize this predates you, Mr. McMahon. But if there had been a fraud on the court, the court has an inherent interest in dealing with that fraud on the court, doesn't it? Yes, but, Your Honor, the court specifically recognized that there was no fraud on the court. Is that a requirement? Is that a requirement to exercise the inherent power of the court? Your Honor, I would simply say that given the plethora of case law on this which cautions the court to utilize its inherent power sparingly, that Judge Woods was well within his discretion to have not utilized the inherent powers of the court with respect to the third amended complaint. It may have been. The problem is that he relied on perhaps a misunderstanding of what the requirements are before you exercise it. We can just send it back to him and let him apply the right standard and then decide whether he thinks it's appropriate. Your Honor, I think that that would, most respectfully, I think that that would be imposing a burden on the court that the court need not take, especially given the fact that the Rule 11 motion based on the same third amended complaint remains with the judge and there's a motion still outstanding. In other words, what happened, Chair, is he utilized Rule 11 and said, I want to know what pre-filing work you did, Mr. Hinton, before you filed the third amended complaint. And it all relies, it all is based on the complaint's allegation that there was $350,000 in expenses that was incurred. And, you know, that was what he was focused on. And that's what he focused the Rule 11 on. As far as the rest is concerned, to the extent that they're complaining that there were delays in discovery, etc., etc., they're not really appropriate for purposes of the inherent powers of the court. And I don't believe that the judge erred in the slightest in that regard. All right. Well, I think that's your two minutes, Mr. Mann. So thanks very much. We will reserve decision on this case. That concludes our argument calendar for this morning. We have another pair of cases that are on submission and we'll resolve those also. We'll reserve decision on those as well. So I'll ask the...